IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
ATLANTIC STATES LEGAL FOUNDATION, STATE
OF NEW YORK and DENISE SHEEHAN, as
Commissioner of the New York State Department
of Environmental Conservation,                                        88-CV-0066

                                              Plaintiffs,

                    -vs-
                                                                Judge Scullin
                                                                Senior
THE ONONDAGA COUNTY DEPARTMENT OF
DRAINAGE AND SANITATION and ONONDAGA
COUNTY, NEW YORK,

                                              Defendants.
-------------------------------------------------------------------------------X

## ORDER AMENDING THE
## AMENDED CONSENT JUDGMENT

**WHEREAS**, this Court (McAvoy, J.) entered an amended consent judgment ("ACJ") on

January 20, 1998, with the consent of the State of New York and John P. Cahill, as commissioner

of environmental conservation (Denise Sheehan is the current commissioner of environmental

conservation) (collectively, the "State"), the Atlantic States Legal Foundation ("ASLF") and

Onondaga County and the Onondaga County Department of Water Environment Protection

(formerly known as the Department of Drainage and Sanitation)(collectively, the "County"),

which resolved the claims asserted in this action brought under the federal Clean Water Act and

the New York State Environmental Conservation Law, article 17; and

    **WHEREAS,**  the ACJ requires, *inter alia*, the County to implement various upgrades

and other measures that are needed to bring the County's effluent discharges into compliance

with the State's effluent limitations and water quality standards; and

1

**WHEREAS,** the ACJ contains, *inter alia*, compliance schedules for meeting effluent limitations for ammonia and phosphorus discharged from the County's Metropolitan Syracuse Wastewater Treatment Plant ("Metro") and the ACJ establishes major and minor milestone dates by which various upgrades, including construction related activities, are to be commenced and completed for Metro and the County's combined sewer overflows ("CSOs"); and

**WHEREAS,** the County is subject to stipulated penalties and other remedies in the event that it fails to satisfy any of its obligations under the ACJ, including the obligation to comply with effluent limitation compliance dates and milestone dates; and

**WHEREAS,** the ACJ was amended by stipulation and order entered May 1, 1998, revising the major milestone dates for the construction and operation of the Franklin Floatables Control Facility Project and the Maltbie Street Floatables Control Facility Project; and

**WHEREAS,** overall, the County has made and continues to make significant progress in implementing the terms of the ACJ; and

**WHEREAS,** the State acting through the Department of Environmental Conservation ("DEC") has extended some minor milestone dates consistent with its authority under the ACJ; and

**WHEREAS,** changing effluent limitation compliance schedules, major milestone dates and the ACJ mandated upgrades requires Court approval; and

**WHEREAS,** some elements of the upgrades and other remedial measures required in the ACJ have not or will not be implemented by the County in accordance with the applicable major milestone compliance date; and

2

**WHEREAS,** some elements of the upgrades and other remedial measures that the ACJ requires the County to implement need to be modified in order to better achieve their intended purpose and such modification would require minor adjustments in the effluent limitation compliance schedule; and

**WHEREAS,** the State has now moved this Court for an order amending the ACJ so that the ACJ as amended by the order would provide for the altered facts and circumstances set forth above, and has submitted this proposed order for entry; and

**WHEREAS,** ASLF and the County were consulted in drafting the proposed order and do not oppose the State's motion.

**NOW THEREFORE,** it is **ORDERED** that the ACJ, as amended by the stipulation and order entered May 1, 1998, is further amended and modified as follows:

1. Except as amended and modified herein, the ACJ as amended by the stipulation and order entered May 1, 1998 is hereby ratified and reaffirmed and shall remain in full force and effect.

## Harbor Brook CSO Abatement Project

2. The ACJ currently provides as follows:

Harbor Brook In-Water System. The CSO abatement proposed on Harbor Brook will use an in-lake technology called the EquiFlow system. The intent of this project is to be a demonstration project to determine the technical applicability of its use in this location. The maximum term of the initial project is 15 years. This system will provide an opportunity to demonstrate abatement of CSO, urban storm water, and non-point pollution through a combination of floatable solids entrapment, in-water storage, pumpback, and treatment at METRO. The in-water system will also include the construction of a floatable solids netting device to remove CSO and stormwater floatables from Harbor Brook before they reach the EquiFlow system. The design basis for the demonstration facility is one-half of

the one year design storm  which equates to a storage volume of 13 million gallons.

Five years after commencement of operation, a technical evaluation shall be completed and submitted to the DEC for review and approval.  If the project is not deemed technically acceptable, the County will proceed with the design and construction of the Delaware and State Fair RTFs at a construction schedule to be proposed by the County to DEC.

If DEC approves the project for the full fifteen years interim period then at the end of the fifteen years the County may propose a final alternative subject to applicable SEQRA and permitting requirements.

ACJ, Appendix B, Section III, paragraph 10.  As a CSO Interim Project, the County was

obligated to complete construction and begin operation by July 1, 2002.  ACJ, Appendix B,

Section IV, paragraph 1.

3. As of this date, the County has neither completed nor commenced construction of this

project.

4. The County represents that the construction of this project is not feasible because the

sediments at the mouth of Harbor Brook upon which the project would be constructed are

contaminated with hazardous wastes and substances, and the County further represents that there

is an ongoing migration of contaminants at the mouth of Harbor Brook.  The State and ASLF

agree that under these facts, construction of the Harbor Brook In-Water Project is not feasible. As

an alternative, the County has developed and submitted to the State for approval a final facilities

plan for the abatement of CSOs into Harbor Brook ("Facilities Plan"), and to construct and

commence operation of the facilities by January 1, 2012.  The Facilities Plan includes a proposed

schedule for the design and construction of the project including planned construction phasing,

and proposed minor and major milestone compliance dates; and further provides that the County

4

will construct the facility and commence operation on or before January 1, 2012. On October 6, 2006 the State approved the Facilities Plan.

5. The Harbor Brook In-Water Project is a project that the County agreed to provide, in part, in settlement of the State's claims against it. Thus, the project is a material element of the ACJ. Although the County was aware of the presence of contaminants in the sediments in Harbor Brook at the time it agreed to implement the Harbor Brook In-Water Project in 1997, the County represents that it was not aware at that time of the full extent of contamination or that there is ongoing migration of contaminants into Harbor Brook. The State has determined that constructing and commencing to operate the CSO abatement facilities by January 1, 2012 as set forth in the approved Facilities Plan will not fully compensate the public for the environmental benefit lost as a consequence of the County's failure to construct and operate the Harbor Brook In-Water System by July 1, 2002.

6. Consequently, the ACJ is hereby amended and modified as follows:

(a) the County shall design, construct, maintain, and modify and/or supplement, as necessary, a CSO control and upgrade program for the abatement of CSOs into Harbor Brook in compliance with the requirements of the ACJ including without limitation paragraph 14 of the ACJ. The County shall construct in its entirety and commence operation of the Harbor Brook CSO abatement facilities, as set forth in the approved Facilities Plan including the minor and major compliance dates, no later then January 1, 2012;

(b) within thirty days of entry of this order the County shall pay to the State as a penalty the sum of $20,000;

(c) the County shall provide a total of $145,000 for an environmental benefits project(s) ("EBP") within the Harbor Brook watershed as selected by a resolution of the Onondaga Lake Partnership ("OLP"), consistent with the OLP's procedures and purposes; provided, however, in the event that an EBP within the Harbor Brook watershed is not selected by the OLP within 12 months of the entry of this order, then the County shall provide a total of said $145,000 for an EPB(s) within the Onondaga Lake watershed as selected by a resolution of the OLP, consistent with the OLP's procedures and purposes. The OLP was established pursuant to section 573 of the federal Water Resources Development Act of 1999, PL 106-53. The OLP's statutory purpose, in part, is to assist in the development, implementation and coordination of cleanup and restoration efforts, including the ACJ, for Onondaga Lake and its environs. The County shall provide said total of $145,000 for the EPB(s) within 90 days after the OLP selects the EBP(s) and designates to whom the funds shall be paid. The term "project" as used in this paragraph includes within its meaning any discrete element of a potentially larger undertaking which discrete element the OLP has selected for implementation, *e.g.*, a feasibility study. The term "project" as used in this paragraph does not include within its meaning any undertaking or discrete element thereof which is an enforceable legal obligation of the County. In the event that an EBP within the Onondaga Lake watershed is not selected by the OLP as provided above within 36 months of the entry of this order, then the County shall pay said total of $145,000 to the State as a penalty pursuant to ECL article 17 within 90 days of written notification from the State that such payment is due; and,

(d) the foregoing obligations shall be in lieu of the obligations set forth in the ACJ, Appendix B, section III, paragraph 10.

6

**Midland Avenue CSO Regional Treatment Facility and Conveyances Project**

7.  The ACJ currently provides as follows:

1.  Midland Avenue Conveyances Project: The service area for this facility encompasses the majority of the combined sewer area on the southern end of the City of Syracuse. The pipelines and regulators will be sized on the basis of a one-year storm.  Even above the one-year storm, the collection system will intercept a high percentage of the volume associated with these precipitation events.

2.  Midland Avenue Regional Treatment Facility ("RTF") Project: The Midland Avenue RTF Project will be located near Oxford Street and Onondaga Creek. The proposed treatment facility will include coarse screening in front of the facilities pump station wet well. Pumps will be used to lift the flow from the CSO transmission pipelines up to the vortex device where floatables and gross solids will be removed. The flow will then proceed to the disinfection tank, where it will be disinfected with either sodium hypochlorite or another disinfectant recommended after completion of the Newell Street CSO disinfection demonstration project. All treatment and transmission processes will be sized to accommodate the one-year storm at this facility. Concentrated solids from the RTF will be discharged back into the Main Interceptor Sewer (MIS) for treatment at METRO. This facility incorporates an interconnection to the MIS to capture overflows from the MIS during intense rainfall events. The only time that the interconnection will be active is during MIS surcharging conditions, thereby ensuring that the more concentrated "first flush" of pollutants is retained within the MIS.

ACJ, Appendix B, Section III, paragraphs 1, 2.  As Major CSO Projects, the County is required to complete construction and begin operation of the Midland Avenue RTF Project by May 1, 2007.  ACJ, Appendix B, Section IV, paragraph 5.

8.  The County has not satisfied various minor milestone compliance dates with respect to this project and it is anticipated by all parties that the County will not satisfy the May 1, 2007 major milestone compliance date for completing construction and commencing operation of this project.  The County's nonfulfillment of the minor milestone dates and its anticipated nonfulfillment of the major milestone date are due, at least in part, to an ongoing dispute between

the County of Onondaga and the City of Syracuse ("City") and the Syracuse Urban Renewal

Agency ("SURA") concerning title to real property.  The County has begun and is proceeding

with construction of the Midland RTF on property that, in part, the County took by eminent

domain from the City and SURA.   The County's condemnation of this property was the subject

of a third-party action filed by the County before this Court which concluded with the entry on

January 5, 2004 of a "Final Judgment In Third-Party Action With Reservation Of The Right To

Appeal" (McAvoy, J.).  The City and SURA appealed from the January 5, 2004 Final Judgment

and by decision dated September 21, 2006, the United States Court of Appeals for the Second

Circuit certified certain state law questions to the New York Court of Appeals which has

accepted the certification and has established a briefing schedule.

     9. It is the desire of the parties that if the dispute between the County, the City of

Syracuse and SURA is resolved with finality in the near future, that the parties will agree upon

and submit to this Court for approval a further amendment to the ACJ that will establish a new

major milestone date for this project and will resolve any and all related issues.

     10. In light of the unresolved nature of the County's alleged on-going violations of the

ACJ with respect to the Midland Avenue RTF Project and the related on-going litigation between

the County, the City and SURA, the State and ASLF reserve all claims and remedies available to

them under the ACJ with respect to the County's obligation to construct and operate the Midland

Avenue RTF in accordance with the milestone schedule, and the County reserves all defenses

and any other avenues of relief that may be available to it under the ACJ.

**Ammonia/Phosphorus Effluent Reduction Compliance
Schedule and METRO Construction Compliance Schedule**

**11.** The ACJ provides as follows with respect to Stage II ammonia effluent compliance:

Beginning no later than May 1, 2004, the County shall not exceed an ammonia effluent limit measured as ammonia ("NH₃") of 2 milligrams per liter ("mg/l") from June 1 through October 31, and 4 mg/l from November 1 through May 31, measured as a thirty day average.

ACJ, paragraph 7.

**12.** The ACJ provides as follows with respect to Stage III ammonia effluent compliance:

Beginning no later than December 1, 2012, the County shall: A. not exceed an ammonia effluent limit of 1.2 mg/l measured as ammonia ("NH₃") from June 1 through October 31, and 2.4 mg/l from November 1 through May 31, measured as a thirty day average

ACJ, paragraph 9.A.

**13.** The ACJ further provides, in pertinent part, that the County shall (a) complete construction of the Full Scale Ammonia Removal Project, which is designed to meet the Stage II ammonia effluent limits, by the major milestone date of November 1, 2003 (ACJ, Appendix A, Section II, paragraph 7); (b) complete construction and commence operation of the Phosphorus Removal/ Effluent Filtration Project, which is designed to meet the Stage II phosphorus effluent limits, by the major milestone date of April 1, 2005 (ACJ, Appendix A, Section II, paragraph 12); and (c) complete construction and commence full operation of the projects that will meet Stage III effluent limitations for both ammonia and phosphorus by the major milestone date of June 1, 2012 (ACJ, Appendix A, Section II, paragraph 21).

**14.** In the process of developing preliminary designs for Stage II and Stage III ammonia removal facilities, and Stage II phosphorus removal facility, the County concluded that the goals

9

of the ACJ would be advanced and a significant savings in design, construction and operation costs realized if the construction of these facilities were to be consolidated.  The County further concluded that if construction were consolidated it would be able to meet the Stage III ammonia effluent limit well ahead of the milestone schedule.  The County therefore proceeded to construct the projects under a consolidated design plan.  As a result, the Stage III ammonia limit was met seven years and seven months ahead of schedule (the ACJ currently sets a major milestone date of December 1, 2012 for Stage III ammonia removal).

**15.**  The State has reviewed the County's proposal and has concluded that consolidating the design and construction of these facilities will advance the overall goals of the ACJ and is therefore in the public interest.  ASLF concurs in the State's conclusion.

**16.**  Consequently, the ACJ is hereby amended and modified as follows: the Stage III ammonia effluent limit which the County is currently obligated to meet by December 1, 2012, as provided in the ACJ, paragraph 9.A, is revised to May 1, 2005.

### Onondaga Creek Floatables Control Facility

**17.**  The ACJ currently provides as follows:

> Onondaga Creek Floatables Control Facility (Boom with Collection Structure). The Onondaga Creek facility will be located downstream of all CSOs which discharge into the creek and above the Inner Harbor area. The best location appears to be in Onondaga Creek just downstream of the Kirkpatrick Street bridge and just upstream of the Inner Harbor.  The County will implement the plan once developed and approved.

ACJ, Appendix B, Section III, paragraph 15.  As an interim CSO project, the County was required to complete construction and begin operation by July 1, 2002.  ACJ, Appendix B, Section IV, paragraph 1.

18. The County has concluded, after attempting to design an effective control boom and collection structure, including the review of data obtained from the use of a pilot mechanism, that such a structure would not be effective given the flow regime in Onondaga Creek. The State concurs in this conclusion. The County proposes, as an alternative, the use of a skimmer boat to collect floatables. The County has in fact used a skimmer boat since June 2002 to collect floatables and has found this system to be effective. The County's proposal is acceptable to the State and ASLF.

19. Consequently, the ACJ is hereby amended and modified as follows: the County shall prevent or minimize the entry of floatables from Onondaga Creek into Onondaga Lake by using a skimmer boat within the Inner Harbor, Canal and conjunction of the Canal with the Lake to collect such floatables. The County shall operate the skimmer boat from May 1 through November 1 of each year, unless the County concludes and the State agrees that such operation is precluded by weather conditions, until all CSOs discharging into Onondaga Creek have been upgraded as provided in the ACJ or by December 1, 2012, whichever occurs first. The County shall provide six months written notice to the parties prior to termination of the use of the skimmer boat. The County has been and as of the date of this order is in compliance with its obligations under Appendix B, Section III, paragraph 15 of the ACJ.

### Kirkpatrick Street Pumping Station Upgrade

20. The ACJ currently provides as follows:

Kirkpatrick Street Pumping Station Upgrade. The Kirkpatrick Street Pumping Station is the only large pump station in the combined sewer system. This facility was constructed in 1973 to pump flow from the Hiawatha trunk sewer into the MIS. A comprehensive wastewater facilities plan and sewer system evaluation survey will be developed for the proposed upgrade of this facility to address the

> wastewater transportation needs of the Hiawatha trunk sewer and Oil City
> redevelopment areas. The pump station discharge will be removed from the main
> interceptor sewer and redirected to the headworks at METRO.  Additional
> measures will include refitting the pump station with new pumps, drives, and
> controllers, as well as modifications at CSO 075 as specified in the SPDES permit
> to eliminate discharges for storms up to the one-year storm.

ACJ, Appendix B, Section III, paragraph 12.  As an interim CSO project, the County was

required to complete construction and begin operation by July 1, 2002.  ACJ, Appendix B,

Section IV, paragraph 1.

21.  The County represents that it significantly expanded the scope of this project in order

to better achieve its purpose under the ACJ to insure maximum flow of wet weather combined

sewage to Metro for treatment while minimizing overflows in the combined sewer system at an

increased cost to the County of over six million dollars.  The State and ASLF concur.  As a result

of the added work as well as encountering unexpected site conditions (subsurface obstructions

and highly saline groundwater) which required additional work, the project was not completed

until November 1, 2002, four months past the major milestone schedule. The County represents

that no overflows resulted during these four months.

22.  Consequently, the ACJ is amended and modified as follows: the major milestone

compliance date applicable to the Kirkpatrick Street Pumping Station Upgrade is hereby

extended, *nunc pro tunc*, from July 1, 2002 to November 1, 2002.

### Oxygenation Demonstration Project

23.  The ACJ currently provides as follows:

> The County shall develop and implement an oxygenation demonstration project in
> Onondaga Lake ("Oxygenation Demonstration Project") to determine whether
> lake-wide oxygenation can be used as an interim measure pending compliance by
> the County with the Stage III requirements set forth in paragraph 9 or the

12

fulfillment of the obligations set forth in paragraph 11. The goals of the project will be (a) to determine and report on the feasibility and suitability of implementing a lake-wide system to supplement point and non-point source controls for the attainment and maintenance of in-lake dissolved oxygen standards, as an interim measure; and (b) to prevent oxygen depletion in the epilimnion, in the fall, after lake turnover and the associated migration of aquatic species from the Lake. To achieve compliance with this requirement the County shall meet the compliance dates set forth in the Oxygenation Demonstration Project Compliance Schedule, which is attached as Appendix C, and hereby made an enforceable part of this Amended Consent Judgment. The final report on feasibility shall be submitted by the County in approvable form and content on or before April 1, 2002, and if lake-wide oxygenation is viable, the report will include a plan for such implementation. If lake-wide oxygenation is determined to be viable, DEC in consultation with EPA will endeavor to develop a long-term implementation plan and to identify any parties that may be liable for the implementation of such a plan.

ACJ, paragraph 15. The ACJ, Appendix C, provides further that:

I. The County shall implement an in-lake oxygenation demonstration project. The goal of the project will be:

a. to determine and report on the feasibility and suitability of implementing a lake-wide system to supplement point and non-point source controls for the attainment and maintenance of in-lake dissolved oxygen standards; and

b. to prevent oxygen depletion in the epilimnion, in the fall, after turnover and the associated migration of aquatic species from the Lake.

II. A technical work group which includes representatives from DEC, EPA and outside experts (selected by DEC in consultation with EPA), will be established to provide peer review and develop the experimental design and demonstration project work plan by October 1, 1998. The County shall begin implementation in accordance with the work plan by May 1, 1999, which date shall be a Major milestone compliance date within the meaning of paragraph 28 of the Amended Consent Judgment.

A technical report shall be generated to determine whether implementing lake-wide aeration is a feasible interim remedy. If lake-wide oxygenation is viable, the technical report will include a plan for implementation, including:

• the recommended full-scale aeration program;

13

- the recommended implementation schedule; and
- the estimated costs

The report on the feasibility must be submitted to the DEC for review by, April 1, 2003, which date shall be a Major milestone compliance date within the meaning of paragraph 31 of the Amended Consent Judgment.

ACJ, Appendix C.

24. Based on numerous discussions over the past several years regarding the benefits and risks associated with the implementation of the Oxygenation Demonstration Project; data generated by the Ambient Monitoring Program demonstrating that the Lake's oxygen levels have improved significantly, particularly during the fall turnover; and data, information and scientific interpretations from other sources, the State in consultation with the United States Environmental Protection Agency has concluded that it would not be in the public interest to pursue this project at the present time. ASLF concurs in this conclusion.

25. Consequently, the ACJ is amended to provide that the County's obligations with respect to the Oxygenation Demonstration Project are suspended unless or until such time that the State determines that the project is necessary to achieve the goals specified in the ACJ, Paragraph 15; provided, however, that such determination is made and transmitted to the County before all other actions required under the ACJ are completed as provided in paragraph 62 of the ACJ.

### Newell Street RTF Testing of Disinfection Technologies

26. The ACJ provides as follows:

Newell RTF. The Newell Street project will involve the testing of alternative disinfection technologies, and thereby sets the basis for the disinfection technology to be used at subsequent RTF facilities.

14

ACJ, Appendix B, Section III, paragraph 9.   As an interim CSO project, the County was

obligated to complete work by the major milestone date of July 1, 2002.  ACJ, Appendix B,

Section IV, paragraph 1.

27.  The Newell Street Disinfection Report submitted by the County on July 31, 2001 was

not approved by the State because the report was based on literature review rather than site

specific flow data.  (The necessary flow regimes at the Newell Street RTF did not occur during

the study period.)

28.  The State agrees to accept the National Water Environment Research Foundation

(NWERF) Evaluation of Alternative Disinfection Technologies report in lieu of the Newell

Street Disinfection Report.  The County submitted the NWERF report to the State on November

9, 2004.

### Environmental Monitors

29.  The ACJ provides as follows:

The County shall fund an "Environmental Monitor," a full time position within
DEC, in order to provide oversight of the activities set forth above, in accordance
with the provisions of Appendix E. The County shall fund the monitor for the
period of time commencing with the entry of this Amended Consent judgment by
the Court and concluding with the termination of this Amended Consent
Judgment as provided in paragraph 62.

ACJ, paragraph 18.

30.  ACJ paragraph 18 is hereby amended to read as follows:

The County shall fund two "Environmental Monitors," as full time positions in
order to provide oversight of the activities required under the ACJ, in accordance
with the provisions of Appendix E-1 as amended by this order (hereinafter,
"Appendix E-1"). The County shall fund the environmental monitors  for the
period of time commencing with the entry of this order by the Court and
concluding with the termination of the ACJ as provided in paragraph 62.

15

31. Appendix E of the ACJ is hereby superceded in its entirety and the following is substituted in its place:

APPENDIX E-1

Environmental Monitors

1. The County or its designee shall fund two environmental monitors, as full time positions, in accordance with paragraph 18 of the ACJ as amended by this order, to provide oversight of the activities required under the ACJ. The environmental monitors shall be either employees of DEC as set forth in paragraph 10 below, or third party independent environmental monitors ("IEMs") as set forth in paragraphs 2-9 below, or a combination of both. DEC in its sole discretion shall determine whether the monitors are DEC employees, IEMs, or a combination of both. DEC's determination shall be in writing, and may be changed on a bi-annual basis, upon 90 days written notice to the County. Environmental monitors who are DEC employees shall be funded by the County in accordance with paragraph 10 below. DEC employee monitors shall be funded at levels sufficient to fund a New York State Civil Service Salary Grade 24 Environmental Engineer II and a New York Civil Service Salary Grade 25 Research Scientist. Environmental monitors who are IEMs shall be funded by the County in accordance with the agreement between the County and the IEM. In either case, one of the environmental monitors shall be a professional engineer duly licensed to practice in New York State, and the other shall be an environmental scientist. The County shall fund the monitors for the period of time commencing with the entry of this order by the Court and concluding with the termination of the ACJ as provided in paragraph 62.

Independent Environmental Monitors

2. Subject to DEC's determination as provided in paragraph 1 above, within 90 days of the entry of this order, the County shall, at its own expense, retain the services of two IEMs to provide independent environmental monitoring services. These services shall be provided in accordance with an IEM Service Agreement ("IEM Agreement") described in paragraphs 4-6, below.

3. An IEM may be either an individual, partnership, corporation, governmental or inter-state entity. The County's selection of the IEMs shall be subject to approval by DEC in its sole discretion. Individuals and

16

engineering, consulting, and other types of entities who are currently performing consulting, contracting or any other type of work for the County, are precluded from consideration as an IEM, unless otherwise approved by DEC. In the event that an IEM is not an individual, then the IEM shall have on its staff a New York State licensed professional engineer or environmental scientist with doctoral level of education or its equivalent who shall be responsible for all environmental monitoring activities under the ACJ. An IEM may subcontract for specialized services (e.g., geologic or liner installation) with the prior written approval of the DEC. If the IEM is an individual, he/she must be a New York State licensed professional engineer or an environmental scientist with a doctoral level of education or its equivalent.

4.  The monitoring services shall be conducted in accordance with the terms of an agreement between the County and the IEM ("IEM Agreement"). The IEM Agreement shall include the name(s) of the IEM's New York State licensed professional engineer(s) and/or environmental scientist responsible for the environmental monitoring activities. The IEM Agreement must be approved by DEC's prior to the IEM performing any of its responsibilities. All provisions of this appendix regarding the IEM shall be incorporated into the IEM Agreement. The IEM Agreement must specify the minimum time that the IEM is required to be on site and the activities that are to be monitored. In addition, the IEM Agreement shall set forth the County's and the IEM's obligations as follows:

A. The County's Obligations:

i. Each IEM will have the right to access any of the County's facilities that are addressed by the ACJ at all reasonable times;

ii. Each IEM will have the right to review any information located at the County's facilities that would otherwise be available to DEC staff in the normal course of their duties; and

iii. It is anticipated that each IEM will be provided with adequate office space at DEC Region 7 offices. In the event such space is not available, the County shall provide adequate office space. This office space shall include, at a minimum: a lockable desk, chair, lockable file cabinet, telephone service, computer equipment, electricity, lights, heat and air conditioning.

B. The IEM's Obligations:

i. Each IEM shall be available either by telephone, cell phone, e-mail, or other similar means to DEC staff at all times that the IEM is present at one of the County's facilities;

ii. Each IEM and the IEM's staff, if any, shall report directly to, and be supervised by DEC;

iii. In the event that an IEM determines that a violation of the ACJ, or any other legal authority may exist, the IEM must notify the DEC as soon as possible after the violation is discovered in accordance with procedures established by DEC. Each IEM shall assist the DEC in any investigation or enforcement action that is taken against the County for any violation. Any written notice of violation that DEC transmits to the County shall be copied to ASLF.

5. The IEM Agreement shall provide for the development of a Work Plan by the County and the IEM, subject to approval by DEC. The Work Plan shall include, but is not limited to, a detailed description of the following:

A. The monitoring of the County's facilities during construction to ensure the facilities are constructed in accordance with the design plans and the requirements of the ACJ;

B. The monitoring of County facilities during operation to ensure compliance with the requirements of the ACJ;

C. The conducting of inspections of County' facilities and the completion of a DEC approved inspection report noting all major activities that occurred during the day of the inspection, and documenting any violations of the ACJ;

D. The review and comment to be done on all reports, plans, and specifications submitted by the County to DEC; and

E. Where deemed appropriate by DEC, the monitoring, sampling or assessment activities pursuant to the ACJ.

6. The IEM Agreement shall further provide:

A. All documentation, inspection reports, logs, photos, and records developed, collected or generated by any IEM in connection with the monitoring of the County Facilities addressed by the ACJ shall be the sole property of DEC and are not subject to prior review or approval by the

18

County.  All IEMs shall retain all monitoring materials or copies of the monitoring materials at DEC's Region 7 office, and these monitoring materials shall remain at that location in the event that a new IEM assumes the environmental monitoring responsibilities.

B.  All original monitoring materials shall be transmitted to DEC in a manner and frequency to be determined by DEC.

7.  DEC staff or an IEM shall have the right to seek any other non-confidential and non-privileged information from the County pertaining to environmental compliance activities under the ACJ as needed, and all such information shall be supplied to DEC staff or the IEM at a frequency to be determined by DEC.

8.  The continued retention, discharge or replacement of an IEM shall be subject to the approval of DEC at its sole discretion.  In the event that the County seeks to replace an IEM, the County shall submit a written request to DEC at least 30 calendar days prior to the proposed termination date for the current IEM.  The request shall include information regarding the County's proposed replacement IEM as well as an explanation of the reasons for the requested change.  DEC's written approval must be obtained prior to the termination of the existing IEM and the employment of a new IEM.

9.  The continuity of monitoring services shall be maintained during any transition period from one IEM to another in order to ensure appropriate facility monitoring, unless otherwise approved by DEC in writing.

DEC Employees as Environmental Monitors

10.  In the event that an environmental monitor is a DEC employee then the County shall establish and maintain an account with DEC to fully fund that environmental monitor as follows, for the duration of all activities required by the ACJ:

A.  The funds required to support the monitoring requirements shall be provided to DEC.  This sum shall be based on annual Environmental Monitor service costs.  Subsequent annual payments shall be made for the duration of the ACJ to maintain an account balance sufficient to meet the next year's anticipated expenses.  The County shall be billed annually for each State fiscal year beginning April 1st of the applicable year.

B.  DEC may revise the required payment on an annual basis to include all costs of monitoring to the DEC.  The annual revision may take into account factors such as inflation, salary increases, and changes in

19

operating hours and procedures including the anticipated termination of the ACJ pursuant to paragraph 62. Upon written request by the County, DEC shall provide that entity with a written explanation of the basis for any modification. If such a revision is required, DEC will notify the County of such a revision no later than 30 days in advance of any such revision.

C.  Prior to making its annual payment, the County will receive and have an opportunity to review an annual work plan for activities that DEC will undertake pursuant to the ACJ, during the year.

D.  Payments are to be made within 30 days of receiving a bill from DEC. Payments for this account shall be in addition to any other funds previously paid by the County for environmental monitoring services. Payments shall be addressed to:

NYS DEC
Bureau of Revenue Accounting (10th Floor)
625 Broadway
Albany, NY 12233-5012
Attn: Robert Schwank

Payments are to be in advance of the period in which they will be expended.

11.  Failure to make the required payments shall be a violation of the ACJ. The State reserves all rights to take appropriate action to enforce the above payment provisions.

General Provisions

12.  The Environmental Monitors shall, when present at any Onondaga County facility, abide by all of the Onondaga County's health and safety and operational requirements and policies; provided, however, that this subparagraph shall not be construed as limiting the Environmental Monitors' powers as otherwise provided for by law and shall not result in the Environmental Monitor being less protected than if he or she were to abide by State and Federal health and safety requirements.

13.  The Environmental Monitors shall receive from Onondaga County all general safety training which is normally given to new site employees. This training will be supplement to the mandatory safety training that Environmental Monitors receive from DEC.

20

14. Onondaga County shall furnish to Environmental Monitors a current site policy and procedures manual for health and safety issues. Within ten (10) days of any revision to the health and safety plan, Onondaga County shall notify DEC in writing, of such modification.

**32.** The ACJ is further amended by the addition of Appendix E-2 as an enforceable provision. ASLF oversight shall be provided for in accordance with Appendix E-2 as set forth below:

## APPENDIX E-2

1. The County shall pay to ASLF Clean Water Act citizen suit allowable costs incurred by ASLF for purposes solely of scientific and technical review and oversight of the County's implementation of the various upgrades and other measures that are required under the ACJ, as amended, to bring the County's effluent discharges into compliance with the State's effluent limitations and water quality standards. In furtherance of same, allowable activities include, but are not limited to, ASLF review of technical documents and attendance at ACJ related meetings convened by any of the ACJ parties which is attended by more than one of any of the ACJ parties and participation in the work of the County Onondaga Lake Technical Advisory Committee pursuant to ACJ Appendix D II (6). The County shall pay such costs in an amount not to exceed $25,000 per annum, for the period  starting January 1, 2006 and concluding when the County's obligations under the ACJ have been satisfied as provided in paragraph 62 of the ACJ. Notwithstanding the January 1, 2006 start date contained in the preceding sentence, the payment of no more than $25,000 for the year 2006 shall include all costs incurred for work performed by the president of ASLF commencing March 5, 2004, with regard to the ACJ amendments addressed by this order  The County shall not be obligated to make any payment to ASLF pursuant to this paragraph unless and until ASLF submits to the County, on a quarterly basis, or such other basis as the County and ASLF agree to in writing, an itemized statement of costs based on contemporaneously maintained records, detailing with specificity how the costs for which reimbursement is sought were incurred, including the name of the person providing the service, the date, time and place of such service and a detailed description of the service that would allow a reasonable person to determine whether or not the service involved the scientific and/or technical review and oversight of the County's implementation of the various upgrades, other measures and obligations that are required under the ACJ. The billing rate charged by ASLF shall be $175 per hour in 2006 and that rate may increase from time to time based upon the prevailing rates in the United States District Court for the Northern District of New York for experts of comparable skill, experience and

education to the individual(s) performing the scientific and technical review and oversight. All payments shall be made to ASLF within 30 days of the submission by ASLF of a request for payment that satisfies the above requirements.  Any dispute arising under this paragraph shall be resolved by the Court upon the motion of either party and ASLF may seek and the County may oppose an award of fees incurred as a result of that motion.

2.  The County shall pay to ASLF within 30 days of entry of this order attorney's fees in an amount not to exceed $16,000 at an hourly rate of $240 for costs incurred by ASLF for its attorney with regard to the ACJ amendments addressed by this order; provided, however, that an itemized statement of such costs pursuant to paragraph 1 of this Appendix E-2 shall be provided to the County within 5 days of entry of this order.

3.  Paragraph 35 of this order and Paragraphs 1 and 2 of this Appendix E-2 shall not alter or modify the provisions of paragraphs 54 - 55 of the ACJ which shall remain in full force and effect. The provisions of paragraph 35 of this order and paragraphs 1 and 2 of this Appendix E-2 are without prejudice to the parties respective reading of paragraphs 54 - 55 of the ACJ.

### Sewer Separation CSO Basin 37 and CSO Basin 47

**33.**  The ACJ provides as follows:

Sewer Separation: Sewer separation is an effective approach for abating CSO discharges for a selected portion of the Onondaga Creek basis. It is less expensive to separate a number of small and remote CSO basins than to incorporate them into other RTFs or FCFs. The following sewers are selected for separation: 022, 024, 037, 038, 040, 045, 046A, 046B, 048, 050, 051, 053, 054, 057, 058, and 059.

ACJ Appendix B, Section III, Paragraph 7.

**34.**  Upon review of infrastructure needs and in the interests of minimizing cost and

disruption and maximizing the impact of sewer separation projects, the State has determined that

CSO Basin 047 should be substituted for CSO Basin 045 to be separated because CSO Basin 045

has been eliminated by direct connection into the Midland Phase Three conveyance system.  In

addition, CSO Basin 037 should be deleted from sewer separation because Basin 037 has been

connected directly to the Clinton RTF and this alternative plan is a more cost effective and less disruptive abatement plan than sewer separation.

35. Consequently, ACJ Appendix B, Section III, Paragraph 7 is amended and modified to read as follows:

> Sewer Separation: Sewer separation is an effective approach for abating CSO discharges for a selected portion of the Onondaga Creek basin. It is less expensive to separate a number of small and remote CSO basins than to incorporate them into other RTFs or FCFs. The following sewers are selected for separation: 022, 024, 038, 040, 046A, 046B, 047, 048, 050, 051, 053, 054, 057, 058, and 059.

SO ORDERED: _____     DATED: 12/14/06
                    U.S.C.D.J.

23