IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X

ATLANTIC STATES LEGAL FOUNDATION, STATE
OF NEW YORK and ALEXANDER B. GRANNIS, as
Commissioner of the New York State Department
of Environmental Conservation,                                    88-CV-0066

                                                    Plaintiffs,

                        -vs-                                      Senior Judge Scullin

THE ONONDAGA COUNTY DEPARTMENT OF
DRAINAGE AND SANITATION and ONONDAGA
COUNTY, NEW YORK,

                                                    Defendants.
------------------------------------------------------------------------------X

## FOURTH STIPULATION AND ORDER AMENDING
## THE AMENDED CONSENT JUDGMENT

The State of New York and Alexander B. Grannis as state Commissioner of

Environmental Conservation (collectively, the "State"), Atlantic States Legal Foundation

("ASLF") and Onondaga County and the Onondaga County Department of Water Environment

Protection (formerly known as the Department of Drainage and Sanitation)(collectively, the

"County"), represent as follows:

1. On January 20, 1998 this Court (McAvoy, J.) entered an amended consent judgment

("ACJ"), with the consent of the plaintiffs State and ASLF and defendant Onondaga County

(collectively, the "parties"), which resolved the claims asserted by the State and ASLF against the

County in this action brought under the federal Clean Water Act and the New York State

Environmental Conservation Law, article 17.

2. The ACJ was subsequently amended by orders entered on May 1, 1998, December 14,

2006 and April 25, 2008 (hereinafter, the "ACJ").

## METRO'S STAGE III PHOSPHORUS LIMIT

3. The ACJ obligated the County, beginning no later than April 1, 2006, not to exceed a phosphorus effluent limit of 0.12 mg/l (Stage II Phosphorus Limit") with respect to effluent discharges from the Metropolitan Syracuse Wastewater Treatment Plant ("METRO") (*see* ACJ ¶ 8) and the County has met and continues to meet this limitation.

4. The ACJ further obligated the County, beginning no later than December 1, 2012, not to exceed a phosphorus effluent limit of 0.02 mg/l ("Stage III Phosphorus Limit") with respect to effluent discharges from METRO, or such revised effluent limit for phosphorus that the State may adopt in accordance with lawful procedures (*see* ACJ ¶¶ 9, 12).

5. The ACJ also obligated the County to conduct a pilot-scale demonstration project to evaluate the feasibility of new and innovative technology for removal of phosphorus from METRO's effluent with the goal of achieving the 0.02 mg/l effluent limit requirements (*see* ACJ ¶ 10(B); Appendix A(I)(5)) and the County has conducted such a pilot-scale demonstration project.

6. The ACJ further obligated the County to demonstrate to the satisfaction of the State on or before February 1, 2009 that the 0.02 mg/l phosphorus limit (or such revised effluent limit that the State may adopt) can be met, and in the event that the County is unable to so demonstrate, it is obligated to divert METRO's effluent to the Seneca River or implement another engineering alternative which fully complies with the applicable effluent limits and the water quality standards for Onondaga Lake no later than December 1, 2012 (*see* ACJ ¶ 11).

7. The pilot-scale demonstration project conducted by the County shows that there are many factors that will affect full-scale performance and estimates that the County could reliably

achieve effluent phosphorus concentrations in the 0.04 to 0.05 mg/l range.

8. The State is evaluating, in accordance with procedures and criteria established by federal and state law, and consistent with the provisions in the ACJ (*see* ACJ ¶ 12), the total maximum daily load ("TMDL") for phosphorus that Onondaga Lake can assimilate consistent with applicable water quality standards, for the purpose, in part, of evaluating the potential impact of the phosphorus in METRO's effluent on the Lake's water quality.

9. As required by the ACJ (*see* ACJ ¶¶ 16-18), the County has monitored and continues to monitor on a monthly basis the levels of phosphorus in Onondaga Lake and such monitoring shows a significant decrease in the average concentrations of phosphorus since the County began to implement the requisite upgrades to METRO.

10. In order for the State to draw scientifically valid and supportable conclusions from the field data available for the Lake for purposes of conducting the TMDL assessment process, the State needs the assistance of the mechanistic water quality model being developed for Onondaga Lake by Onondaga County under the auspices of the Onondaga Lake Partnership ("OLP"), a body established by federal law (*see* Water Resources Development Act of 1999, P.L.106-53) and comprised of representatives from the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency ("EPA"), the New York State Department of Environmental Conservation, the New York State Attorney General's Office, the County of Onondaga and the City of Syracuse.

11. It is anticipated by the parties that the mechanistic water quality model will be a useful predictive tool that, when utilized with models already developed for upstream and downstream of the Lake, will simulate how the Onondaga Lake system will respond to changes

3

in nutrient and contaminant loading, source reductions, wastewater treatment plant improvements and TMDL allocations.  Since the Lake system is complex because of continuous variations from hydrologic, biologic and chemical processes in and tributary to the Lake, model development is complex requiring extensive data sets and state-of-the-art computer analysis.  A scientific peer review process is also being used as this model is being developed.  Currently, new data is being evaluated to determine if further modifications to the model are necessary and the model must still be validated and applied.  Approximately one more year is needed to complete the model, at which point the State will need an additional six months to one year, approximately, to complete the TMDL process for phosphorus.

12.  Based on the foregoing, the parties agree that paragraph 11 of the ACJ should be amended to (i) extend the deadline by which the County must demonstrate its ability not to exceed a phosphorus effluent limit of 0.02 mg/l, or such revised phosphorus effluent limit that the State may adopt (*see* ACJ ¶ 12), from the current February 1, 2009 to December 31, 2011, and (ii) in the event that the County can not demonstrate by December 31, 2011 its ability to comply with the 0.02 mg/l phosphorus effluent limit or such revised limit the State may adopt, to extend the County's time from December 1, 2012 to December 31, 2015  to divert METRO's effluent to the Seneca River or implement another State approved engineering alternative that complies with the applicable phosphorus effluent limit.

## COMBINED SEWER OVERFLOWS ("CSOs") UPGRADES

13.  The County's sewer system combines sanitary effluent with stormwater runoff. During normal dry-weather conditions, the sewage is conveyed to METRO for full (tertiary) treatment, subject to a 120 million gallons a day ("mgd") capacity limitation, and subsequent

discharge to Onondaga Lake. However, during precipitation events when stormwater enters the combined sewer system, the resulting volume may exceed the system's transport and storage capacity. As a result, a mixture of stormwater and raw sanitary sewage is discharged through multiple combined sewer overflow points ("CSOs") directly into Onondaga Creek and Harbor Brook, both of which are tributaries of and flow into Onondaga Lake.

14. The ACJ requires the County to implement specified engineering upgrades and other measures related to the CSOs that would, *inter alia*, (i) significantly reduce or eliminate the discharge of untreated combined sewage effluent into Onondaga Lake and the tributaries to Onondaga Lake, and (ii) bring the County's effluent discharges into compliance with the State's effluent limitations and the applicable water quality standards for the receiving waters. The ACJ further requires the County to implement these engineering upgrades and other measures in accordance with design specifications approved by the state Department of Environmental Conservation ("DEC").

15. The design specifications and projects approved by DEC obligate the County to implement CSO engineering upgrades and other projects that would capture for treatment 95% of the total volume of combined sewage collected by the system during precipitation events, calculated on a system-wide annual average basis. Under the DEC approved plans, of the 95%, 88% would be piped to METRO for full (tertiary) treatment, subject to METRO's 120 mgd treatment capacity, prior to discharge into Onondaga Lake. The remaining 7% would receive only primary treatment and disinfection at Regional Treatment facilities prior to discharge into Onondaga Creek and Harbor Brook. The various CSO projects mandated by the ACJ included the following projects:

5

(i) The Clinton Regional Treatment Facility ("RTF"), is designed to store combined sewage effluent, remove floatables and provide, prior to discharge, partial (primary) treatment and disinfection for approximately 238 million gallons per year ("mgy") of untreated combined sewage that is currently being discharged from 11 CSOs into Onondaga Creek during precipitation events. The Clinton RTF is designed, as approved by DEC, to achieve 100% capture and primary treatment and disinfection, calculated on a system-wide annual average basis, within the meaning of EPA's National CSO Control Policy, for all combined sewage generated in the Clinton Sewer Service Area. In view of the April 25, 2008 stipulation and order amending the ACJ and the application for Court approval of this stipulation and proposed order, construction of the Clinton RTF has not yet begun.

(ii) The Harbor Brook RTFs I and II are designed to store combined sewage effluent, remove floatables and provide partial (primary) treatment and disinfection for the approximately 141 mgy of combined sewage that is currently being discharged untreated from 18 CSOs into Harbor Brook during precipitation events. The Harbor Brook RTFs are designed, as approved by DEC, to achieve 100% capture and primary treatment and disinfection, calculated on a system-wide annual average basis, within the meaning of EPA's National CSO Control Policy, for all combined sewage generated in the Harbor Brook Sewer Service Area. In view of the April 25, 2008 stipulation and order amending the ACJ and the application for Court approval of this stipulation and proposed order, construction of the Harbor Brook RTFs I and II have not yet begun.

(iii) The Midland RTF and Conveyance Project Phases I, II and III, are designed to store combined sewage effluent, remove floatables and provide partial (primary) treatment and

6

disinfection for the approximately 196 mgy of combined sewage that was being discharged untreated, pre-ACJ, from 10 CSOs into Onondaga Creek during precipitation events from CSOs located upstream of the Clinton Sewer Service Area. *See* ¶ 15(i), above. The Midland RTF, was designed, as approved by DEC, to a achieve 100% capture and primary treatment and disinfection, calculated on a system-wide annual average basis, within the meaning of EPA's National CSO Control Policy, for all combined sewage generated in the Midland Sewer Service Area. Phases I and II of the Midland RTF and Conveyance Project were completed in 2008 and currently store and treat 88 mgy of combined sewage from 3 of the 10 CSOs. The as-yet-to-be built Phase III Conveyance Project consists of constructing a 7,700 foot conveyance line to the already-built Midland RTF that would transport combined sewage from the remaining 7 CSOs (CSOs 044, 045, 060/077, 076, 061, 052 and 067) all of which are upstream of the Midland RTF, for the storage and treatment of the additional 108 mgy of combined sewage at the Midland RTF. CSOs 044, 045, 060/077, 076, 061, 052 and 067 currently discharge untreated combined sewage into Onondaga Creek during precipitation events.

16. At the time the ACJ was entered on January 20, 1998, the County captured for treatment on a system-wide annual average basis an estimated 74% by volume of the combined sewage (sanitary effluent with stormwater runoff) collected in the combined sewer system during precipitation events. To-date, following the implementation of certain CSO upgrade projects mandated by the ACJ, the County reports that it is eliminating or capturing for treatment on a system-wide annual average basis, an estimated 84.6% by volume of the combined sewage collected in the combined sewer system during precipitation events which includes treatment at the Midland RTF. As of the date of this Stipulation and Order, each percentage point represents

approximately 40 million gallons of sewage.

17. The RTFs have a number of limitations, including the fact that the RTFs provide only primary treatment with disinfection before discharging the combined sewage into Onondaga Creek and Harbor Brook, in contrast to the more extensive tertiary treatment that can be provided by METRO. In addition, the construction of an RTF often involves disruption to the community in which it is located.

18. Since entry of the ACJ in January of 1998, progress has been made in the development and use of "green infrastructure" for purposes of combined sewer overflow control. Green infrastructure is a combination of management approaches and technologies that utilize, enhance and/or mimic the natural hydrologic cycle processes of infiltration, evapotranspiration and reuse. Green infrastructure approaches can include, but are not limited to, wetlands, green roofs, trees, tree boxes, rain gardens, vegetated swales, infiltration planters, permeable pavements, vegetated median strips, re-forestation/re-vegetation, and protection and enhancement of riparian buffers and flood plains. Green infrastructure can be used in lieu of, or in conjunction with "gray infrastructure," the more traditional concrete and steel engineering technologies such as tunnels, pipes, storage basins, treatment facilities and sewer separation. Green infrastructure can be, and has been, used to reduce the volume of rainwater that would ordinarily enter a combined sewer system so as to reduce sewer overflow and thereby reduce the amount of untreated effluent discharging to surface waters. Stormwater captured through certain types of green infrastructure may be subject to a higher level of pollutant removal as compared to treatment by an RTF.

19. The ACJ expressly recognizes that it "encompasses a series of scientific and

8

engineering undertakings over a period of fifteen years which are based on currently available scientific information and technologies," and that "scientific knowledge and technology may advance over time" and that it may be appropriate to incorporate such advances in science and technology into the scientific and engineering undertakings required by the ACJ (*see* ACJ ¶ 41).

20. The ACJ provides, in part, that "[t]he terms and conditions of this Amended Consent Judgment may be modified by the written agreement of all the parties, on notice to EPA, and the approval of the Court" (*see* ACJ ¶ 42).

21. On the application of the State, ASLF and the County, on notice to EPA and the United States Department of Justice, this Court amended the ACJ by order entered April 25, 2008, placing on hold for a two month period of time further actions by the County related to the design and implementation of the Clinton and Harbor Brook CSO projects required by the ACJ and extending by one year the concomitant major milestone deadlines for these projects in order to allow the parties to review these projects for the purpose, in part, of evaluating the feasibility and utility of using green infrastructure in lieu of or in combination with the gray infrastructure currently required by the ACJ.

22. The parties have concluded that the implementation of certain specific combined green and gray infrastructure projects to address the discharge of raw sewage from CSOs into Onondaga Creek and Harbor Brook in conjunction with other green/gray infrastructure projects yet to be fully or specifically designed, will provide additional benefits as compared to the use of gray infrastructure alone as provided by the ACJ in its current form.

23. The State, ASLF and the County hereby agree and stipulate to the entry of this proposed order by the Court.

9

NOW THEREFORE, it is **ORDERED** that the ACJ is further amended as follows:

## METRO'S STAGE III PHOSPHORUS LIMIT

24. The compliance dates established in paragraph 11 of the ACJ – which establishes February 1, 2009 as the deadline by which time the County must demonstrate its ability to meet, *inter alia*, the phosphorus effluent limit set in paragraph 9 and upon its failure to so demonstrate requires the County to divert METRO's effluent to the Seneca River or to implement another engineering alternative such that it fully complies with water quality standards no later than December 1, 2012 – are hereby amended by deleting "February 1, 2009" and inserting in its place "December 31 2011"; deleting "December 1, 2012" and inserting in its place "December 31, 2015"; and by adding at the end of the paragraph "The DEC may in its discretion, and after consultation with EPA, extend the December 31, 2011 and the December 31, 2015 dates by six months each. Such extensions shall be in writing transmitted by the State's attorney of record to the attorneys of record for the County and ASLF with a copy to USEPA." Paragraph 11 as amended shall read (amended terms in bold):

> 11. In the event that the County is unable to demonstrate the ability to meet either the effluent limits set in subparagraphs 9.A and 9.B, or the effluent limits referred to in subparagraph 9.C by **December 31, 2011**, or such earlier date for demonstrating whether the effluent limits can be met as may be established by DEC by a Determination, then the County shall cease causing or contributing to the violation of water quality standards in Onondaga Lake by diverting Metro's effluent to the Seneca River or by implementing another engineering alternative which fully complies with the water quality standards no later than **December 31, 2015. The DEC may in its discretion and after consultation with EPA, extend the December 31, 2011 and the December 31, 2015 dates by six months each. Such extensions shall be in a writing transmitted by the attorney of record for the State to the attorneys of record for the County and ASLF with a copy to USEPA.**

10

25. The ACJ is hereby amended by inserting the following additional paragraphs numbered 11A and 11B:

11A.   The County shall undertake the following obligations in regards to phosphorus:

(i) The County shall conduct studies to identify the extent of phosphorous bioavailability in Onondaga Lake and the extent to which Onondaga Creek flow plunges into Onondaga Lake. Said studies shall be developed and implemented in consultation with DEC, EPA and ASLF. The results of these studies should be utilized by the County in the development and implementation of the mechanistic water quality model being developed for Onondaga Lake. Said studies shall be completed and submitted for review by DEC, EPA and ASLF and approval by DEC in consultation with EPA, no later than December 31, 2010.

(ii)   The County shall perform an optimization analysis of its current phosphorus treatment at METRO and submit a summary of said analysis to DEC, EPA and ASLF for review and approval by DEC in consultation with EPA, no later than August 31, 2011. Said summary shall include recommendations, if any, to further reduce phosphorus effluent from METRO and said recommendations shall be implemented upon approval by DEC in accordance with a DEC established milestone schedule.

(iii) The County, in consultation with DEC, EPA and ASLF, shall develop a work plan to: analyze the current limit of technology for phosphorous reduction at METRO including associated costs and time frames for implementation; conduct additional engineering feasibility studies on other technologies found to be capable of meeting treatment levels below Equivalent Effluent Quality (0.10 mg/l) down to the 0.02 mg/l phosphorus effluent limit with associated costs and time frames for implementation; and include a feasibility assessment with cost analysis determination and construction time frame for diverting the METRO discharge to the Seneca River or any other feasible alternative. Said work plan shall be submitted to DEC, EPA and ASLF by April 1, 2010 and shall include implementation dates for completing the work therein. Upon approval by DEC said work plan shall be implemented in accordance with said dates which shall become major milestone compliance dates.

11B. Paragraph 8 of the ACJ is amended such that one year after entry of this Fourth Stipulation and Order, the Stage II phosphorus limit of 0.12 mg/l set forth in Paragraph 8 of the ACJ shall become 0.10 mg/l.

11

## COMBINED SEWER OVERFLOWS ("CSOs") UPGRADES

26.  Paragraph 41 of the ACJ is hereby amended to specifically identify Green Infrastructure as a technology that may be utilized to achieve the CSO control requirements set forth in paragraph 14 of the ACJ, by inserting in the third sentence of paragraph 42 the following terms:

> more efficient or more effective manner including, for purposes of achieving the CSO control requirements set forth in paragraph 14, the utilization of "Green Infrastructure",

such that paragraph 41, as so amended, shall read (amended terms in bold):

> 41.  This Amended Consent Judgment encompasses a series of scientific and engineering undertakings over a period of fifteen years which are based on currently available scientific information and technologies. The parties recognize that scientific knowledge and technology may advance over time. In the event that DEC concludes, based upon information obtained pursuant to this Amended Consent Judgment or from any other source, that work required pursuant to the Metro Construction Compliance Schedule, the CSO Control and Upgrade Compliance Schedule, or the Oxygenation Demonstration Compliance Schedule is duplicative, unnecessary, will not achieve the effluent limitations and surface water standards provided for in paragraphs 5 through 11, or that there are proven technologies available that could satisfy the requirements of this Amended Consent Judgment in a less costly, **more efficient or more effective manner including, for purposes of achieving the CSO control requirements set forth in paragraph 14, the utilization of "Green Infrastructure,"** then the State may by Determination, revise the County's obligations accordingly, provided that the Determination is consistent with the requirements, including compliance dates, set forth in paragraphs 5 through 11. Any Determination made pursuant to this paragraph is subject to review pursuant to the terms and conditions in paragraph 39, except that (a) in addition to the County, ASLF may also file a petition seeking review, and (b) the Determination shall not be set aside except upon a finding that such Determination is arbitrary or capricious or contrary to the terms of paragraphs 5 through 11.

27.  The ACJ is hereby amended by inserting the following additional paragraphs numbered 14A through 14P:

> 14A.  The County's obligations to construct the (i) Clinton RTF, (ii) Harbor Brook RTFs I and II, and (iii) Phase III of the Midland RTF and Conveyances Project (pipeline connecting the Midland Avenue RTF to CSOs 044, 060-077, 076,052 and 067), as set forth, with respect to the Clinton RTF, in Appendix B (CSO Construction Milestone Compliance Schedule), Part III (CSO Project Descriptions), paragraph 4; with respect to the Harbor Brook RTFs I and II,

12

in paragraph 6(a) of the Stipulation and Order Amending the ACJ entered December 14, 2006; and with respect to Phase III of the Midland Avenue Conveyances Project, in Appendix B (CSO Construction Milestone Compliance Schedule), Part III (CSO Project Descriptions), paragraphs 1 and 2, are hereby extinguished subject to the provisions in paragraphs 14B and 14J, below.

## CONSTRUCTION OF CSO NO. 044 CONVEYANCE

14B. Notwithstanding the provisions of Paragraph 14A, above, no later than June 1, 2010 which shall be a minor milestone compliance date, the County shall submit for DEC and ASLF review and DEC approval, proposed plans and specifications, including a proposed commencement of construction date which shall be a minor milestone compliance date, to construct a pipeline connecting the Midland Avenue RTF with CSO 044. The County shall complete the construction of the pipeline in accordance with the plan as approved by DEC and commence operation of the said conveyance no later than December 31, 2011 which date shall be a major milestone compliance date.

## COUNTY'S CSO DISCHARGE VOLUME REDUCTION OBLIGATIONS

14C. Onondaga County shall implement such engineering upgrades, including the utilization of gray and green infrastructure, as may be necessary to achieve and maintain compliance with the CSO discharge volume limitations as set forth below in accordance with the milestone compliance dates and other requirements set forth in this Stipulation and Order and shall not cause or contribute to the violation of applicable water quality standards in the receiving waters that may result from effluent discharges from the CSOs.

## CSO COMPLIANCE SCHEDULE – STAGE I

14D. Beginning no later than December 31, 2013, the County shall capture for treatment or eliminate, within the meaning of EPA's National CSO Control Policy, no less than 89.5 % by volume, on a system-wide annual average basis, of the combined sewage generated during precipitation events.

## CSO COMPLIANCE SCHEDULE – STAGE II

14E. Beginning no later than December 31, 2015, the County shall capture for treatment or eliminate, within the meaning of EPA's National CSO Control Policy, no less than 91.4 % by volume, on a system-wide annual average basis, of the combined sewage generated during precipitation events.

## CSO COMPLIANCE SCHEDULE – STAGE III

14F. Beginning no later than December 31, 2016, the County shall capture for treatment or eliminate, within the meaning of EPA's National CSO Control Policy, no less than

13

93.0 % by volume, on a system-wide annual average basis, of the combined sewage generated during precipitation events.

## CSO COMPLIANCE SCHEDULE – STAGE IV

14G. Beginning no later than December 31, 2018, the County shall capture for treatment or eliminate, within the meaning of EPA's National CSO Control Policy, no less than 95.0 % by volume, on a system-wide annual average basis, of the combined sewage generated during precipitation events.

## COUNTY'S REPORTING AND ACCESS REQUIREMENTS

14H. The County shall submit a report on an annual basis ("Annual Report"), no later than April 1st of each year starting on April 1, 2011, for DEC and ASLF review and DEC approval. To the extent applicable in any given year, the Annual Report shall set forth in detail the status and progress during the prior calendar year of the various gray and green programs and projects required under the ACJ as amended by this Stipulation and Order. The report shall also set forth in detail those gray and green programs and projects that the County proposes to implement/construct to satisfy the requirements of the ACJ as amended by this Stipulation and Order, including proposals by the County to implement additional projects to address compliance shortfalls as required pursuant to paragraph 14J. To the extent applicable, each Annual Report shall include but is not limited to:

(i) detailed descriptions of each proposed green and/or gray project including location, size, projected capture rate and volume and the methodology used to arrive at the projection, as well as proposed major and minor compliance dates,
(ii) operation and maintenance requirements,
(iii) ownership, control, access and terms of use of the subject properties,
(iv) CSO monitoring program data,
(v) specific actions to coordinate and provide incentives for projects to be undertaken with the cooperation and/or participation of the City of Syracuse and private property owners (e.g., revisions of local ordinances, tax credits, grants, subsidies, etc.),
(vi) a green infrastructure outreach plan to advise the community of the benefits of green infrastructure and encourage cooperation with its implementation,
(vii) post-construction monitoring,
(viii) SWMM update - reporting on SWMM outputs, calibration/verification using actual monitoring data, reconciliation of SWMM values and measured CSO volume capture results, and (ix) program re-assessment including the estimated percent CSO volume capture/elimination values reported above, compliance with the ACJ milestones and requirements, and recommendations on future actions to maintain compliance with the ACJ.

Items (viii) and (ix) above, shall be certified by a New York State licensed engineer. The County

shall allow DEC access to all project sites and records for purposes of inspection and review.

## DETERMINATION OF COMPLIANCE

14I.  In order to determine compliance with the requirements in paragraphs 14C, 14D, 14E, 14F and 14G above, no later than December 31, 2011, which date shall be a major milestone compliance date, the County shall, as directed in writing by DEC, complete the installation at representative CSOs and thereafter maintain in working order of flow meters or other monitoring devices capable of measuring the volume of effluent being discharged from the representative CSOs, including the date and time of such discharges.  The County shall, as directed by DEC, update the Stormwater Management Model ("SWMM") on a yearly basis, using actual monitoring data to verify, reconcile and re-calibrate as necessary, SWMM values and outputs.  The DEC will utilize data from the CSO monitoring devices, the SWMM and other data and models to determine the County's compliance with the requirements of paragraphs 14C through and including 14G above.  DEC's annual compliance determinations, starting in 2014, will be made following receipt of the Annual Report from the County due by April 1 of each year.  Such DEC determinations are subject to the dispute resolution provisions in paragraphs 37 - 41 of the ACJ.  However, the County shall not dispute or challenge the adequacy, reliability or accuracy of the CSO monitoring data, the SWMM, or the applicability of the SWMM and the SWMM's data outputs for the purposes of determining such compliance.

## CONSTRUCTION OF ADDITIONAL GRAY AND/OR GREEN INFRASTRUCTURE TO ADDRESS COMPLIANCE SHORTFALLS

14J.  In the event that the County's Annual Report, required pursuant to paragraph 14H above, indicates a projected compliance shortfall in the CSO discharge volume limitations for that year, then the Report shall set forth for DEC and ASLF review, and DEC approval, a proposed plan to construct additional gray and/or green infrastructure which may include utilization of the gray treatment technology addressed in paragraph 14A above, which shall be designed with sufficient capacity to make up the compliance shortfall.  The County's plan shall include proposed major and minor milestone compliance dates including a proposed date for the completion of construction and/or implementation which date shall be a major milestone compliance date.  The County shall construct and commence operation of the requisite gray and or green infrastructure, as approved by DEC, in accordance with the approved milestone schedule, and thereafter operate and maintain the said facilities and/or project(s).  In the event that the subsequent compliance determination made by DEC pursuant to paragraph 14I above, shows a greater compliance shortfall than projected in the County's Annual Report then the County shall remedy this compliance shortfall, subject to DEC approval.  At the time the County submits the proposed plan(s) referred to in this paragraph, it shall (i) have the legal and enforceable right at the selected location to construct and maintain such gray and or green infrastructure facilities or maximize the use of or expand such existing or planned facilities, as may be necessary in order to satisfy its obligations under the ACJ as amended by this Stipulation and Order or (ii) demonstrate the likelihood of obtaining and maintaining such legal and

15

enforceable right by the time of the required commencement of construction and or implementation.

## STIPULATED PENALTIES FOR VIOLATION OF THE CSO DISCHARGE VOLUME LIMITATIONS

14K. Because the ACJ does not establish CSO discharge volume limitations, and, consequently, the stipulated penalties set forth in the ACJ do not address violations of CSO discharge volume limitations, the following stipulated penalties shall apply to any such violations. Upon a determination by DEC that the County has failed to satisfy the applicable CSO discharge volume limitation, made on a system-wide annual average basis, as provided in paragraph 14H above, the County shall pay to the State a stipulated penalty of $150,000.00 for each calendar year violation of the applicable volume limitation. In the event that the violation is greater than 0.5% then the County shall pay to the State an additional $50,000.00 for each additional 0.1% that exceeds the applicable volume limitation. Payments shall be made in accordance with the requirements of paragraphs 32-33 of the ACJ. The payment of such stipulated penalties by the County does not alter the County's obligations under paragraph 14C-14G above, nor does such payment alter the State's right, pursuant to paragraph 34 of the ACJ, to seek to enjoin the continued violation of this Stipulation and Order. The County's violation of any of the terms and conditions of this Fourth Stipulation and Order, including violation of major and minor milestone compliance dates but excluding violation of the CSO discharge volume limitations and the associated compliance dates referenced in paragraphs 14D-14G, which are addressed separately in this paragraph, shall be subject to the stipulated penalties set forth in paragraphs 30-36 of the ACJ.

## COUNTY'S OBLIGATION TO CONSTRUCT SPECIFIC GRAY INFRASTRUCTURE PROJECTS

14L. The County shall, in compliance with the respective minor milestone compliance dates set forth in appendix A attached hereto and incorporated herein, submit for DEC and ASLF review and DEC approval proposed plans and specifications for the construction of the gray infrastructure projects listed below and, subject to DEC approval, shall thereafter complete the construction and commence the operation of these gray infrastructure projects in compliance with the respective major milestone compliance dates set forth in Appendix A:

    i. Harbor Brook – 3.2 MG storage facility at State Fair Blvd,
    ii. Harbor Brook Interceptor Replacement,
    iii. Erie Blvd Storage System modification to Gate Chamber, and
    iv. Clinton 3.7 MG storage facility (Trolley Lot)

## COUNTY'S OBLIGATION TO CONSTRUCT GREEN
## INFRASTRUCTURE PROJECTS

14M.  The County shall construct, implement and maintain such green infrastructure projects as it deems necessary to satisfy the CSO discharge volume limitations set forth in paragraphs 14C through and including 14G above. Attached as Appendix B which is incorporated herein, is a non-exhaustive listing by way of example of various green infrastructure projects that the County is currently planning to implement.

## FUTURE REDUCTIONS IN DISCHARGES FROM THE CSOs

14N.  In the event that the County achieves and maintains the CSO discharge volume limitation set forth in paragraph 14G above and demonstrates that the CSOs are not causing or contributing to a violation of the applicable water quality standards in the receiving waters for one full year, then the parties may petition the Court, jointly or separately, for an order deeming the CSO related obligations set forth in this Fourth Stipulation and Order satisfied provided that upon the granting of such petition, the County's obligation to maintain the 95% CSO volume limitation set forth in paragraph 14G is made part of and addressed in the County's SPDES permit to be enforced in the ordinary course of the State's regulatory process.

## COUNTY'S SUBMISSION OF THE FACILITIES PLAN
## AND FLOATABLES CONTROL PLAN.

14O.  Within one year of entry of this Stipulation and Order, the County shall submit for DEC and ASLF review and DEC approval: (i) a plan for the assessment of all the County's CSO outfalls and a proposed implementation schedule (major and minor milestone dates) to address floatable controls, as necessary, on all the remaining CSO outfalls; and (ii) a detailed facilities plan to address CSO outfall numbers 022, 027, 029, 052 and 060/077. The facilities plan shall also assess reconstruction or replacement of the Newell Street facility. Said plan shall be stamped by a New York State licensed professional engineer and shall include: an engineering evaluation of existing CSOs and an assessment of alternatives for addressing capture of said CSOs. The plan shall include proposed projects to address each CSO and a proposed implementation schedule for completing said projects. Upon approval by DEC of projects and completion dates, said completion dates shall become major milestone compliance dates under the ACJ and the County shall be obligated to construct said projects by the designated milestone dates.

## TERMS OF THE ACJ APPLY

14P.  Paragraphs 14A through 14O above are an integral part of the ACJ and, except as expressly provided for in paragraph 14K above (stipulated penalties for violation of the CSO volume discharge limitations), shall be subject to the provisions of the ACJ including

without limitation paragraphs 19-23 (Transmission, Review and Approval of Submittals), paragraphs 30-36 (Stipulated Penalties), paragraphs 37-42 (Dispute Resolution), paragraphs 44-45 (Force Majeure, expressly including the provision that financial considerations of the County shall not be considered a force majeure).

     28. The ACJ is hereby amended by inserting the following additional paragraph

numbered 16a:

> 16a. No later than 6 months after the entry of the Fourth Stipulation and Order Amending the ACJ, the County shall submit for DEC and ASLF review and DEC approval a proposed modifications to the Ambient Monitoring Program provided for under ACJ paragraphs 16 through 18 and Appendix D, including a schedule for implementation, which proposed modifications shall be designed to enhance monitoring of tributary water quality in those tributaries impacted by CSOs, to determine the effectiveness of the gray and green infrastructure projects implemented pursuant to paragraphs 14C above. The modified monitoring program as approved by DEC shall be implemented no later than August 1, 2010. To the extent not included in the County's SPDES permit for METRO, the County shall propose a plan to monitor the quantity and quality of CSO discharges to determine compliance with water quality standards and capture requirements.

## ENVIRONMENTAL MONITORS

     29. Paragraph 18 and Appendix E of the ACJ as amended by paragraphs 29-31 and

Appendix E-1 of the Order Amending the Amended Consent Judgment dated and filed on December

14, 2006, which require that the County fund two full-time "Environmental Monitors," are hereby

further amended only insofar as deleting references to "two full-time monitors" and inserting in its

place "one full-time and one half-time environmental monitors." The Environmental Monitors so

funded may, at the election of the State, be either an employee of DEC and/or a contract consultant.

If the Environmental Monitor is a DEC employee, he/she shall be funded by the County at a level

sufficient to fund a New York State Civil Service Salary Grade 24 Environmental Engineer II or a

New York Civil Service Salary Grade 25 Research Scientist. If the Environmental Monitor is an

18

Independent Environmental Monitor (IEM), he/she shall be funded by the County in accordance with the agreement between the County and the IEM.

## THE COUNTY'S PAYMENT OF CWA COSTS AND FEES TO ASLF

30. Attached hereto for Court approval is an agreement between the County and ASLF providing for the payment by the County of costs and fees to ASLF under the federal Clean Water Act. The State is not a party to this agreement and takes no position with respect to it. Consequently, the execution of this Stipulation and Order by the State representatives does not signify approval thereof.

## APPROVAL BY THE COUNTY LEGISLATURE

31. The County Legislature shall have no more than forty-five days from the date this proposed Fourth Stipulation and Order Amending the ACJ is approved by the County Executive in a letter, to approve this Fourth Stipulation and Order. In the event that the proposed Fourth Stipulation and Order is not approved by the County Legislature and executed by the County Executive within the above referenced forty-five days then the proposed Fourth Stipulation and Order shall be void. In such event the County shall, subject to such DEC approvals as may be required, forthwith proceed to construct the Regional Treatment facilities and other projects and upgrades required under the ACJ.

32. Except as amended and modified herein, the ACJ is hereby ratified and reaffirmed and shall remain in full force and effect.

19

## APPROVAL BY THE COUNTY LEGISLATURE

31. The County Legislature shall have no more than forty-five days from the date this proposed Fourth Stipulation and Order Amending the ACJ is approved by the County Executive in a letter, to approve this Fourth Stipulation and Order. In the event that the proposed Fourth Stipulation and Order is not approved by the County Legislature and executed by the County Executive within the above referenced forty-five days then the proposed Fourth Stipulation and Order shall be void. In such event the County shall, subject to such DEC approvals as may be required, forthwith proceed to construct the Regional Treatment facilities and other projects and upgrades required under the ACJ.

32. Except as amended and modified herein, the ACJ is hereby ratified and reaffirmed and shall remain in full force and effect.


**SO AGREED:**

**ONONDAGA COUNTY**

Dated: _November 6_____, 2009

_Joanne M. Mahoney_

**Joanne M. Mahoney, County Executive**

**SO AGREED:   [ASLF]**

ATLANTIC STATES LEGAL FOUNDATION

DATED: September 22, 2009

SAMUEL H. SAGE, President

DATED: September 22, 2009

CARL G. DWORKIN, Counsel
Bar Roll No. 104492
44 Bentwood Court
Albany, New York 12203
(518) 452-5442

21

NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION

DATED 9/21/09

_____
ALEXANDER B. GRANNIS, Commissioner of
Environmental Conservation


ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Plaintiffs State of New York and the
New York State Department of Environmental
Conservation

DATED 9/22/09     By: _____
NORMAN SPIEGEL
Assistant Attorney General
Bar Roll No. 102652
120 Broadway
New York, New York 10271
(212) 416-8454


SO ORDERED:_____     DATED: 11/16/09
                    U.S.C.D.J.

22

# APPENDIX A

## APPENDIX A

### i. Harbor Brook 3.2 MG Storage Facility

This 3.2 MG storage facility to store wet weather flows from CSO 003 and 004 will be constructed at the State Fair Boulevard site previously designated for the Lower Basin RTF and when completed is estimated to result in an increase in system-wide CSO volume capture of at least 1.2%.

The following milestones will apply to this facility and necessary conveyances:

- Complete design and submit approvable plans and specifications to DEC for review and approval by January 31, 2011. (minor)
- Commence construction by September 30, 2011 (minor)
- Complete construction and commence operation by December 31, 2013. (major)

### ii. Harbor Brook Interceptor Sewer Replacement

The Harbor Brook Interceptor Sewer will be replaced between Velasko Road and Fayette St. and when completed is estimated to result in an increase in the system-wide CSO volume capture of at least 0.3%.

The following milestones will apply to this project:

- Complete design and submit approvable plans and specifications to DEC for review and approval by August 17, 2009 (minor).
- Commence construction by January 1, 2010. (minor)
- Complete construction and commence operation by December 31, 2013. (major)

### iii. Erie Boulevard Storage System Modification

Gate Chamber #3 in the Erie Boulevard Storage System will be modified and when completed is estimated to result in an increase in the system-wide CSO volume capture of at least 0.2%

The following milestones will apply to this project:

- Submit approvable plans to DEC for review and approval by September 1, 2010. (minor)
- Complete required modifications by December 31, 2011. (major)

### iv. Clinton 3.7 MG Storage Facility

This 3.7 MG storage facility to store wet weather flows from CSO's 028, 030, 031, 032, 033 034, 035, 036, and 037 will be constructed at the Trolley Lot site previously designated for the Clinton RTF and when completed is estimated to result in an increase in the system-wide CSO volume capture of at least 2.3%.

The following milestones will apply to this facility and necessary conveyances:

- Complete design and submit approvable plans and specifications to DEC for review and approval by November 1, 2010. (minor)
- Commence construction by July 1, 2011 (minor)
- Complete construction and commence operation by December 31, 2013. (major)

# APPENDIX B

## APPENDIX B

### Green Infrastructure (GI) Demonstration Program Projects In Design or Recently Constructed

| Green Infrastructure Project | Location | Type of GI | CSO Basin | Completed | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Creekwalk | Jefferson to Fayette Sts. | Porous Pavement, Rain Garden, Infiltration Trenches | C | | | | |
| Rosamond Gifford Zoo | Parking Lot, Main Building (roof) | Infiltration Trench, Cisterns | HB | | | | |
| Rosamond Gifford Zoo | Elephant and Primate exhibit renovation | Infiltration Trenches/Beds, Bioretention, Vegetated Roof, Flexi-Pave, Planters, and Rain Barrels | HB | | | | |
| Flexi-Pave Installations | Catholic Charities, James Ross & Sons, Elmcrest Children's Center, Tully Street Residence, SUNY Upstate, MOST, Home Headquarters, Loretto | Flexi-Pave | C, M, HB | | | | |
| Pervious Concrete Installations | Clinton Commons | Pervious Concrete | C | | | | |
| Pervious Concrete Installations | Liberty Green, Center of Excellence, Creekwalk | Pervious Concrete | C | | | | |
| SUNY-ESF | ESF Campus | Vegetated Roof, Flexi-Pave, Rain Gardens | M | | | | |
| SUNY Walters Hall | 1 Forestry Drive | Green Roof | M | | | | |

Notes: C= Clinton; HB = Harbor Brook; M = Midland

### Green Infrastructure (GI) Demonstration Program Candidate Project List, Status and Conceptual Implementation Schedule

| Green Infrastructure Project | Location | Type of GI | CSO Basin | Completed | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| City Lot #21/Farmer's Market | Clinton and Washington Sts. | Infiltration Bed | C | | | | |
| I-81 at Genesee St. | I-81 at Genesee St. | Drywell / Infiltration Bed | C | | | | |
| Residential Green Streets | | Bioretention/Infiltration Trench | C, M, HB | | | | |
| Green Schools Initiative | | Porous Pavement, Bioretention, Vegetated Roof, and Tree Infiltration Trench | C, M, HB | | | | |
| W. Onondaga Street Triangle | W. Onondaga Street | Bioretention, Pavement Removal, and Urban Orchard/Forestry | C | | | | |
| Civic Strip Project: Surface Lot (County) Rehabilitation | Civic Strip | Porous Pavement, Bioretention, Enhanced Street Trees, Pavement Removal | C | | | | |
| Civic Strip Project: Convention Center Garage | Civic Strip | Bioretention and Infiltration Trenches | C | | | | |
| Civic Strip Project: Green Roofs | 235 Harrison St., others | Vegetated Roof(s) | C | | | | |
| Civic Strip Project: Commercial Green Streets with Pavement Removal | Civic Strip | Porous Pavement, Bioretention, Enhanced Street Trees, Pavement Removal | C | | | | |

Notes: C= Clinton; HB = Harbor Brook; M = Midland



County of Onondaga
## Office of the County Executive
John H. Mulroy Civic Center, 14th Floor
421 Montgomery Street, Syracuse, New York 13202
Phone: 315.435.3516  Fax: 315.435.8582
ongov.net

Joanne M. Mahoney
*County Executive*

William P. Fisher
*Deputy County Executive*

September 21, 2009

**BY ELECTRONIC FILING AND U.S. MAIL**

Hon. Frederick J. Scullin, Jr.
Senior U.S. District Judge
Northern District of New York
James Hanley Federal Building
100 South Clinton Street
P.O. Box 7255
Syracuse, NY 13261-7255

RE: Fourth Stipulation and Order Amending the ACJ

Dear Judge Scullin:

Shortly after I assumed the Office of County Executive in 2008, I worked with Plaintiffs to initiate a preliminary review of the remaining Regional Treatment Facility (RTF) projects. The goal of the review was replacing these projects, if possible, with a combination of alternative technologies, including green infrastructure technology.  Long months of planning and negotiations and a significant financial investment by the County have gone into translating a conceptual agreement between the parties into the revised program incorporated into the settlement now before you.

The new CSO plan reflects a consensus among the parties to the ACJ, the Onondaga Nation, the City of Syracuse and the community at large, that a Revised Long Term Control Plan, which maximizes capture of storm water and treatment of combined sewage at METRO by incorporating green infrastructure and additional storage, is desirable and in the public interest.

I fully endorse the proposed Stipulation and urge its approval by the Court. I will urge its ratification by the Onondaga County Legislature within the forty-five day period agreed to by the parties.

Sincerely,

Joanne M. Mahoney
County Executive

FOR THE NORTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

ATLANTIC STATES LEGAL FOUNDATION, STATE
OF NEW YORK and ALEXANDER B. GRANNIS, as
Commissioner of the New York State Department
of Environmental Conservation,                                    88-CV-0066

                                                    Plaintiffs,

                    -vs-                                  Senior Judge Scullin

THE ONONDAGA COUNTY DEPARTMENT OF
DRAINAGE AND SANITATION and ONONDAGA
COUNTY, NEW YORK,

                                                    Defendants.

----------------------------------------------------------------------X

STIPULATION AND AGREEMENT BETWEEN THE COUNTY OF ONONDAGA
AND PLAINTIFF ATLANTIC STATES LEGAL FOUNDATION FOR PAYMENT OF
ALLOWABLE COSTS AND FEES PURSUANT TO SECTION 505 OF THE CLEAN
WATER ACT

    1)   On January 20, 1998 this Court (McAvoy, J.) entered an Amended Consent

Judgment ("ACJ"), with the consent of the State, ASLF and Onondaga County

(collectively, the "Parties"), which resolved the claims asserted by Plaintiffs State and

ASLF against Defendant County in this action brought under the Federal Clean Water

Act and the New York State Environmental Conservation Law, Article 17.

    2.   The ACJ was subsequently amended by Orders entered on May 1, 1998,

December 14, 2006 and April 25, 2008.

    3.   The Parties recognize that during the 2008 and 2009 calendar years, Atlantic

States Legal Foundation invested many hours of time and effort in participating in the

process of exploring Green Infrastructure and other alternatives to the currently mandated

Clinton Street and Harbor Brook CSO Projects.

1

## ALLOWABLE CITIZEN SUIT FEES AND COSTS

4. Paragraph 32 of the December 14, 2006 Amendments to the ACJ provides as follows:

32. The ACJ is further amended by the addition of Appendix E-2 as an enforceable provision.   ASLF oversight shall be provided for in accordance with Appendix E-2 as set forth below:

APPENDIX E-2

1. The County shall pay to ASLF Clean Water Act citizen suit allowable costs incurred by ASLF for purposes solely of scientific and technical review and oversight of the County's implementation of the various upgrades and other measures that are required under the ACJ, as amended, to bring the County's effluent discharges into compliance with the State's effluent limitations and water quality standards. In furtherance of same, allowable activities include, but are not limited to, ASLF review of technical documents and attendance at ACJ related meetings convened by any of the ACJ parties which is attended by more than one of any of the ACJ parties and participation in the work of the County of Onondaga Lake Technical Advisory Committee pursuant to ACJ Appendix D II (6). The County shall pay such costs in an amount not to exceed $25,000 per annum, for the period starting January 1, 2006 and concluding when the County's obligations under the ACJ have been satisfied as provided in paragraph 62 of the ACJ. Notwithstanding the January 1, 2006 start date contained in the preceding sentence, the payment of no more than $25,000 for the year 2006 shall include all costs incurred for work performed by the president of ASLF commencing March 5, 2004, with regard to the ACJ amendments addressed by this Order. The County shall not be obligated to make any payment to ASLF pursuant to this paragraph unless and until ASLF submits to the County, on a quarterly basis, or such other basis as the County and ASLF agree to in writing, an itemized statement of costs based on contemporaneously maintained records, detailing with specificity how the costs for which reimbursement is sought were incurred, including the name of the person providing the service, the date, time and place of such service and a detailed description of the service that would allow a reasonable person to determine whether or not the service involved the scientific and/or technical review and oversight of the County's implementation of the various upgrades, other measures and obligations that are required under the ACJ. The billing rate charged by ASLF shall be $175 per hour in 2006 and that rate may increase from time to time based upon the prevailing rates in the United States District Court for the Northern District of New York for experts of comparable skill, experience and education to the individual(s) performing the scientific and technical review and oversight. All payments shall be made to ASLF within 30 days of the submission by ASLF

2

of a request for payment that satisfies the above requirements. Any dispute arising under this paragraph shall be resolved by the Court upon the motion of either party and ASLF may seek and the County may oppose an award of fees incurred as a result of that motion.

2. The County shall pay to ASLF within 30 days of entry of this order attorney's fees in an amount not to exceed $16,000 at an hourly rate of $240 for costs incurred by ASLF for its attorney with regard to the ACJ amendments addressed by this Order; provided, however, that an itemized statement of such costs pursuant to paragraph 1 of this Appendix E-2 shall be provided to the County within 5 days of entry of this Order.

3. Paragraph 35 [sic] of this Order and paragraphs 1 and 2 of this Appendix E-2 shall not alter or modify the provisions of paragraphs 54-55 of the ACJ which shall remain in full force and effect. The provisions of paragraph 35 [sic] of this Order and paragraphs 1 and 2 of this Appendix E-2 are without prejudice to the parties' respective reading of paragraphs 54-55 of the ACJ.

5. The County and Atlantic States Legal Foundation agree that solely for the calendar years 2008 and 2009, the compensation payable to the Atlantic States Legal Foundation pursuant to paragraph 32, Appendix E-2(1) of the 2006 Amendments to the ACJ shall be increased from $25,000.00 for each of the aforesaid calendar years as specified at paragraph 2, Appendix E-2, of the 2006 Stipulation and Order to an amount not to exceed:

(i) $55,000.00 for the 2008 calendar year; and

(ii) $90,000.00 for the 2009 calendar year.

6. The additional compensation amount over and above the $25,000.00 for the 2008 and 2009 calendar years shall be inclusive of any and all claims for consulting costs and attorneys' fees and other costs allowable pursuant to Section 505 of the Clean Water Act.

7.   The Parties further recognize that Atlantic States Legal Foundation will continue to participate and incur expenses in connection with its role as Plaintiff. Therefore it is agreed that \Paragraph 32, Appendix E-2(1) of the 2006 Stipulation and Order shall be amended to increase the amount currently payable pursuant to said paragraph 32, Appendix E-2(1) of the 2006 ACJ from the current amount of $25,000.00, to an amount not to exceed $35,000 per annum at the billing rate of $200 per hour, or such other rate that constitutes the prevailing rate in the United States District Court for the Northern District of New York for experts of comparable skill, experience and education to the individual(s) performing the scientific and technical review and oversight, for the period starting January 1, 2010, and concluding when the County's obligations under the ACJ have been satisfied as provided in paragraph 62 of the ACJ.

8.   Nothing contained in the fee provisions of this Stipulation is intended to preclude the County from requesting from and providing additional compensation to ASLF for such other services that the County determines to be appropriate to assist in implementation of this Stipulation and Order.  A non-exclusive listing of the technical and other services that the County may request that ASLF provide is attached hereto in the form of a scope of work and payment terms for a contract, as Appendix 1.

9.   Except with respect to any billing provisions that may be contained in a separate service agreement for technical services pursuant to paragraph 8 of this Stipulation and Order, in all other respects the provisions of paragraph 32 and Appendix E-2 of the 2006 Amendments to the ACJ, including the provisions with respect to ASLF's billing requirements as set forth in Appendix E-2 of the 2006 Amendments to the ACJ, are hereby ratified and shall remain in full force and effect.

**SO AGREED:**

**ONONDAGA COUNTY**

Dated:_____, 2009

_____
Joanne M. Mahoney, County Executive

**ATLANTIC STATES LEGAL FOUNDATION**

Dated:_____, 2009

_____
Samuel H. Sage

**SO ORDERED:** _____   Dated: _____
                          **U.S.C.D.J.**

5

APPENDIX 1

APPENDIX 1

TECHNICAL ASSISTANCE SERVICES

TO BE PROVIDED BY ASLF

The Atlantic States Legal Foundation represents that it possesses the requisite expertise to provide technical assistance to the County in the development and implementation of the Green and Gray Infrastructure Plans. These services are separate and distinct from ASLF's role as Plaintiff payment for which is set forth in paragraphs 5 through 7 of this Stipulation and Order. ASLF will perform the following specific technical consulting services and activities:

- provide technical assistance with the planning and implementation of gray and green infrastructure projects including development of revised Long Term Control Strategy and Gray and Green Infrastructure Plans and Schedules;

- provide technical assistance with development of outreach and education materials and instructional programs and outreach efforts relating to implementation of gray and green infrastructure projects; and

- provide technical advice to Onondaga County on preparation and implementation of the Annual Ambient Water Quality Monitoring Program and provide technical input and technical assistance as requested by the County on interpretation of results, plans for future monitoring efforts and management efforts, and preparation of the annual Ambient Monitoring report; and

- provide technical comments to the County on development, implementation and application of water quality models for Onondaga Lake and the Seneca River; and

- provide general overall technical assistance as requested on projects and programs implemented or to be implemented under the ACJ with emphasis on green infrastructure components; and

- assist the County in organizing and convening a conference of experts focusing on water quality assessment and compliance pursuant to the National CSO Policy, 59 F.R. 16888, (1994) with the goal of developing scientific and policy recommendations with respect to compliance oriented water quality monitoring, and the formulation of wet weather standards that take into consideration both

i

CSO and non-CSO related conditions, including structural and safety related use constraints.

The services outlined above shall be provided pursuant to a separate contract for technical and consulting services through the Central New York Regional Planning and Development Board. The contract between ASLF and the Central New York Regional Planning and Development Board shall be for an annual amount not to exceed:

A. A base salary amount of $60,000.00 to be adjusted annually in accordance with adjustments made to the comparable County full time equivalent position, plus ASLF's applicable fringe costs as detailed in the attached calculations provided by ASLF on or about September 14, 2009 ("Exhibit A to Appendix 1"); and

B. Non personnel services, travel, phone other out of pocket expenses, $1,000.00 per annum; and

C. One time costs, Equipment (computer, printer, software) not to exceed $5,000.00; and

D. Overhead costs, including CNYPRBD Administrative Fees; 20% of annual costs; and

E. Conference planning expenses must be pre-approved by the County and shall be included in the annual charges, however, the actual expenses of the conference and the amount actually payable to ASLF shall be determined after the conference has concluded.

The County shall reimburse costs incurred by the Central New York Regional Planning Board in connection with the aforesaid contract as set forth in items A through D above.

Payment shall be based upon submission of a monthly County claim form containing an itemized statement of costs based on contemporaneously maintained records, detailing with specificity how the costs for which reimbursement is sought were incurred, the date, time and place of the services rendered and a brief description of the service(s) provided during the calendar month for which the invoice is submitted. Reimbursement shall be made by the County within forty-five (45) days of receipt of the claim from the CNYPRBD.

EXHIBIT A TO APPENDIX 1

Exhibit A to Appendix 1



**ATLANTIC STATES
LEGAL FOUNDATION, INC.**

Breakdown of Fringe Benefits

Mandated

| | |
|---|---|
| Social Security/Medicare | .0765 |
| NYS Unemployment Ins | .0100 |
| NYS Disability Insurance | .0100 |
| Worker's Compensation | .0100 |
| Total Mandated | .1065 |

Non Mandated

| | |
|---|---|
| Health Insurance | .1250 |
| Vacations | .0400 |
| Holiday Pay | .0400 |
| Total Non Mandated | .2050 |

| | |
|---|---|
| Total Fringe Benefits | .3115 |

Eleanor Beck, bookkeeper
14 September 2009

858 West Onondaga St. Syracuse, NY 13204-3711   (315) 475-1170   FAX (315) 475-6719   Atlantic.States@aslf.org